UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| TURKEY CREEK COMMUNITY INITIATIVES, NORTH GULFPORT COMMUNITY LAND CONSERVANCY, INC., and GULF RESTORATION NETWORK | § § § § § § | PLAINTIFFS |
| V. | § § | CAUSE NO. 1:08cv124-LG-RHW |
| UNITED STATES ARMY CORPS OF ENGINEERS | § § § | DEFENDANT |

## MEMORANDUM OPINION AND ORDER OF DISMISSAL WITHOUT PREJUDICE FOR LACK OF STANDING

BEFORE THE COURT are Plaintiffs Turkey Creek Community Initiatives, North Gulfport Community Land Conservancy, Inc., and Gulf Restoration Network's [31] Motion for Summary Judgment in Favor of Plaintiffs and Defendant United States Army Corps of Engineers's [34] Cross-Motion for Summary Judgment. Also before the Court are the parties' supplemental briefs.[1] Plaintiffs appeal Defendant's issuance of Regional General Permit 20 ("RGP 20"), which allows the filling of up to three acres of wetlands, per residential development project, in Mississippi's lower six counties. Plaintiffs argue (1) that they were denied past and future public hearings, (2) that there was no Environmental Impact Statement ("EIS"), (3) that RGP 20 is unnecessary, (4) that RGP 20 violates the Clean Water Act's ("CWA's") presumption against the filling of wetlands, and (5) that the Defendant did not consider reasonable alternatives or (6) include restrictive conditions. Defendant argues (1) Plaintiffs lack standing, and (2) Defendant complied with the CWA and (3) the National

---

[1]The Court requested supplemental briefs on the issue of standing.

Environmental Policy Act ("NEPA"). The Court has considered the parties' submissions and the relevant legal authority. Because Plaintiffs lack standing, this matter is dismissed.

## FACTS AND PROCEDURAL HISTORY

On May 23, 2007, Defendant issued RGP 20. Prior to issuance of RGP 20, an Environmental Analysis was performed which resulted in a "Finding of no Significant Impact." Generally, the permit allows the filling of up to three acres of low-quality wetlands, per residential construction project, in the Mississippi Counties of Pearl River, Stone, George, Hancock, Harrison, and Jackson. Excluded from the purview RGP 20 are tidal waters, non-tidal waters that are adjacent to tidal waters, and historical preserves. According to the Defendant, the permit is needed to address the post-Hurricane Katrina need for affordable housing in the lower six counties. RGP 20 provides a process by which an applicant, desiring to fill wetlands and construct a residence or residential project, may obtain an expedited permit to do so. Unlike the individualized permit process, a project under this general permit will not undergo public notice and comment, nor will it be subject to an individual environmental analysis or impact statement. The determination of whether the wetlands are low quality will depend on an assessment of information provided by the individual landowner/applicant. To date, no application has been submitted under RGP 20.

Plaintiffs challenged RGP 20 at the administrative and now the judicial level. One of the named plaintiffs is Gulf Restoration. Gulf Restoration defines itself as, "a diverse network of groups committed to uniting and empowering people to protect and restore the resources of the Gulf Region." (Am. Compl. at 4 (¶7)). Terese P. Collins, Ellis Anderson, and Christopher Hare are members of Gulf Restoration. Collins is currently rebuilding her home which faces the Back

Bay in Biloxi, Harrison County, Mississippi. Her home was flooded during Hurricane Katrina. There are wetlands in front of and adjacent to her home. Anderson lives in Bay St. Louis, Hancock County, Mississippi. He alleges that:

> Hancock County and the area around Bay St. Louis[2] contains many kinds of wetlands–ranging from tidal marshes to pine flatwoods. . . . Some of these areas might even be considered "low quality" wetlands, yet considering their place in the overall health of our coastal environment, that would be a mistaken assumption.
>
> . . . I regularly enjoy all of these types of wetlands areas, from the pristine tidelands to those bordering on developed areas and uplands. I photograph birds and wildlife in these wetlands and adjacent areas. As an amateur naturalist, I often look for native plants along stream banks and the nearby pine flatwoods and try to identify those as well. These wetlands assets are one of the main reasons I chose this area in which to live and do business.
>
> . . . I am concerned that this permit will lead to greater development in the wetlands around Bay St. Louis, and as a result will reduce the populations of fish, birds and plants that I enjoy seeing, and so will diminish my enjoyment of my home, my town and my county. For example, the wooded wetland areas along Highway 603 leading into Bay St. Louis might be considered low quality wetlands–therefore eligible for 'streamlined' this [sic] general permit–yet I have often seen birds and other wildlife in these areas. I'm also alarmed since I understand the role these wetlands play in mitigating flooding. . . .
>
> I am concerned that this regional general permit does not include the usual public notice and comment procedures. I often comment on wetlands permits proposed by the Corps and I am very concerned that the lack of such public comment could lead to adverse impacts on the environment not being identified or taken into account. Public comment may show that 'low quality' areas actually perform valuable wetlands functions.
>
> . . . I fear that policies that encourage wetland loss will put my community at risk for future flooding and devastation.

(Anderson Aff.). Finally, Hare resides in Long Beach, Harrison County, Mississippi. He states

---

[2] It is unclear whether this refers to the City of Bay St. Louis or the Bay of St. Louis itself. The Court will read this ambiguity in the light most favorable to the Plaintiffs.

that there are many canals in Long Beach that pose a flood risk during periods of heavy rain; however, they are surrounded by wetlands that act as a buffer for flood control. He fishes:

> in various parts of Hancock, Harrison, and Stone Counties. My continued enjoyment of fishing is threatened by the loss of wetlands that are an important nursery for aquatic life. . . . I am concerned that this permit will . . . reduce the populations of fish that I can catch. . . . I am very concerned about the development of wetlands in my community and other areas of coastal Mississippi. I have often engaged in the public comment process when proposed wetland development projects have affected areas with which I am familiar. I am concerned that there is no longer any opportunity to provide comments on individual projects that fall under this regional general permit, and that without that . . . opportunity, important wetland areas could be lost. I believe public input from those most affected by development can only aid the Corps of Engineers in reaching equitable and environmentally sound decisions.

(Hare Aff.).

## DISCUSSION

S<small>TANDING</small>

Defendant argues Plaintiffs have no Article III standing, because they lack an injury in fact. Plaintiffs respond that Gulf Restoration has organizational standing, because Collins, Anderson, and Hare have residential, property, recreational, and procedural interests at stake.

Standing is a threshold jurisdictional issue. *Vt. Agency of Natural Res. v. United States*, 529 U.S. 765, 771 (2000). "[T]he requirement that jurisdiction be established as a threshold matter 'springs from the nature of limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (quoting *Mansfield, C. & L. M. R. Co. v. Swan*, 111 U.S. 379, 382 (1884)).

Standing is a question of law. *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002). Article III, Constitutional standing contains three elements: (1) the plaintiff must have

suffered an injury in fact, (2) which is fairly traceable to the challenged conduct of the defendant, and (3) the injury must be likely redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An organization has standing where at least one of its members has standing to sue in his or her own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the member's participation. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). "The party invoking federal jurisdiction bears the burden of establishing these elements. . . . with the manner and degree of evidence required at the successive stages of the litigation." *Defenders*, 504 U.S. at 561.

An injury in fact must be concrete and particularized. *Id.* at 560. It must be actual or imminent and not merely conjectural or hypothetical. *Id.* "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735,(1972)). The plaintiff "must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it." *Defenders*, 504 U.S. at 565-66. On the other hand:

> deprivation of a procedural right without some concrete interest that is affected by the deprivation–a procedural right *in vacuo*–is insufficient to create Article III standing. Only a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."

*Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1151 (2009) (quoting *Defenders*, 504 U.S. at 572 n.7).

5

SUBSTANTIVE INJURY

Plaintiffs argue that three of their members have interests in Harrison, Hancock and Stone Counties and that these interests are in the areas "subject to," i.e., potentially impacted by future application of, RGP 20. (Pls.' Supp. Brief on Standing at 2). Specifically, they allege that there will be increased flooding, water pollution, and loss of habitat, vegetation, and animals, which decreases their property, economic, recreational and aesthetic interests.

The Court is not asked to scrutinize any particular or individual application of RGP 20. Indeed, no project has been, or is being constructed. Moreover, there is no allegation that anyone is so much as contemplating a project under the authority of RGP 20. In fact, Plaintiffs argue that the absence of an application for an RGP 20 project substantiates their claim that there is no need for RGP 20.

Although these Gulf Restoration's members have alleged that they have residential, property, economic, recreational, and aesthetic interests in areas that may someday be impacted by a project under RGP 20, the impact is dependent upon a future project application and approval under the general RGP 20 permit. To show standing based upon a third party's action or inaction, Plaintiffs must allege and prove "those choices have been, or will be, made." *Defenders*, 504 U.S. at 562. It may be that RGP 20 is never used, in which case, there could be no flooding, increased water pollution, or loss of habitat, vegetation, and wildlife caused by RGP 20. In the opinion of the Court, without a particular application issued under the RGP 20 permit at issue, there is no case or controversy before the Court. *Save Ourselves, Inc. v. U.S. Army Corps of Eng'rs*, 958 F.2d 659, 661 (5th Cir. 1992) (where plaintiff did not challenge a specific application of the Corps's grandfathering policy, "future application of this policy is too

contingent to present a controversy ripe for judicial review").

This view is supported by case authority. In *Tex. Indep. Producers & Royalty Owners Ass'n v. Envtl. Prot. Agency*, 410 F.3d 964 (7th Cir. 2005), an environmental group challenged the EPA's "General Permit for Storm Water Discharges from Construction Activities." *Id.* at 967. The general permit applied in Massachusetts, New Hampshire, Idaho, New Mexico, Alaska, and in certain tribal lands. *Id.* at 968. The plaintiff raised substantive and procedural challenges to the permit. *Id.* at 969-70. Plaintiff alleged that its members lived near and made use of water bodies in the states in which construction activities "will be regulated by the General Permit" and "in water bodies directly affected by pollution from construction activities subject to the General Permit." *Id.* at 972. The Seventh Circuit held that the evidence failed "to identify any specific construction project authorized under the General Permit to discharge into these bodies of water" or that the discharges were actually occurring. *Id.* at 973. Instead, "the only potential injury to its members is one that could occur in the future." *Id.* at 975. Therefore, the environmental plaintiff lacked "standing to challenge the substantive provisions of the General Permit." *Id.* at 976.

Similarly, the Court here is asked to find standing under allegations in which certain Gulf Restoration members live near and make use of the wetlands and surrounding areas that may some day, experience some impact, as a result of some construction project that may be approved under the auspices of the RGP 20 permit. Under these circumstances the Court cannot find that Plaintiffs have suffered or will suffer a substantive injury from RGP 20.

PROCEDURAL INJURY

Whether these Plaintiffs have standing to assert a procedural challenge is a separate

question. *Id.* A "person who has been accorded a procedural right to protect his concrete interests can assert that right." *Summers*, 129 S. Ct. at 1151. Their alleged procedural injuries are the failure to conduct an EIS, past failure to conduct a public hearing on RGP 20, and future denial of public notice and comment on any potential construction project under RGP 20.

In *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 674 (5th Cir. 1992), the Fifth Circuit held:

> The procedural injury implicit in agency failure to prepare an EIS -- the creation of a risk that serious environmental impacts will be overlooked -- is itself a sufficient "injury in fact" to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project [such that they can] expect [] to suffer whatever environmental consequences the project may have.

In accord is the Tenth Circuit. In *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448-49 (10th Cir. 1996), the court held that the injury caused by the refusal to conduct an EIS is the increased risk of harm to plaintiff's interests due to an agency's uninformed decision.

For example, in *Sabine River Authority*, the court held that local and state water agencies could challenge a federal agency's failure to conduct an EIS before issuing a non-development easement on 3800 acres of wetlands in East Texas in the area of the Sabine River. *Sabine River Authority*, 951 F.2d at 674. The Sabine River Authority and the Texas Water Conservation Association objected because they had plans to take the property by eminent domain to construct a reservoir. *Id.* at 673. The court found that both plaintiffs had a significant geographical nexus to the subject property, and therefore had procedural standing. *Id.* at 674.

Relying on *Sabine River Authority*, the Western District of Texas held that plaintiffs had standing to challenge a federal agency's failure to issue an EIS or Environmental Assessment

prior to converting a 450-mile crude oil pipeline into a 700-mile refined gas pipeline. *Spiller v. Walker*, No. A 98 CA 255 SS, 1998 U.S. Dist. LEXIS 18341, *18 (W.D. Tex. Aug. 25, 1998). The plaintiffs had a significant geographical nexus to the project, because portions of the pipeline would traverse their lands and water supplies. *Id.*

In *Rio Hondo*, plaintiffs challenged an agency's approval of summertime operation of a ski resort, without first performing an EIS. *Rio Hondo*, 102 F.3d at 446. The plaintiffs lived twelve to fifteen miles downstream of the ski resort. *Id.* at 450. They alleged that the summertime use of the ski areas would decrease their water supply, pollute their water and decrease the aesthetic value of the area. *Id.* The court found they had a significant geographical nexus to the ski area and so had procedural standing. *Id.*

However, in each of these cases, there was a live case or controversy emanating from a specific application of the laws challenged. In *Sabine River Authority*, it was not the agency's general practice of issuing non-development easements, but a specific non-development easement that was challenged. In *Spiller* and *Rio Hondo*, there were specific identifiable projects that were challenged.

In contrast, *Texas Independent Producers* involved a challenge to a general permit, without a specific project or application of the general permit at issue. There, the court found that even though the environmental plaintiff did not have substantive standing, the plaintiff did have standing to challenge the EPA's failure to provide public notice and comment on Notices of Intent to proceed under the general permit and any contractor's Storm Water Pollution Prevention Plan. *Tex. Indep. Producers*, 410 F.3d at 977. The court reasoned that "members use water bodies that may receive discharges authorized by the General Permit and the three affiants

9

stated that they would participate in the decision making process if allowed." *Id.* Therefore, the reasoning in *Tex. Indep. Producers* would seem to support Plaintiffs' procedural challenges here, since they alleged that they use wetlands and other properties that may be filled or otherwise impacted from fills authorized by RGP 20.

The Supreme Court examined a similar issue in *Summers*. The National Forest Service had promulgated a regulation that would exempt small fire-rehabilitation and salvage timber sales from public comment, notice, and appeal. *Summers*, 129 S. Ct. at 1147. Subsequently, a fire destroyed a 238-acre area of the Sequoia National Forest. *Id.* The Service approved a salvage sale of the timber on this area, "the Burnt Ridge project." *Id.* Because it was under 250 acres, the Forest Service did not provide notice or a comment period. *Id.* at 1147-48. Plaintiffs challenged the Forest Service's failure to apply due process procedures to the Burnt Ridge Project and to the Forest Service's regulation of exempting small sales from the notice, comment, and appeal process in general. *Id.* at 1148. The parties ultimately settled their dispute as to the Burnt Ridge Project. *Id.* The Supreme Court held that even though plaintiffs had standing to challenge the Burnt Ridge Project (plaintiffs had concrete interests in that tract of land), plaintiffs lacked standing to challenge the notice and comment exemption in general. *Id.* One of plaintiff's members said that he has and will visit unnamed National Forests. *Id.* at 1150. This allegation was:

> a failure to allege that *any* particular timber sale or other project claimed to be unlawfully subject to the regulations will impede a specific and concrete plan . . . to enjoy the National Forests... Here we are asked to assume not only that Bensman will stumble across a project tract unlawfully subject to the regulations, but also that the tract is about to be developed by the Forest Service in a way that harms his recreational interests, and that he would have commented on the project, but for the regulation.

10

*Id.* In addition, the Court noted that the affidavit did refer to one specific series of projects in the Allegheny National Forest, but the affiant only expressed a "some day" intention to go there. *Id.* at 1150-51. Therefore he lacked standing to challenge the past inability to comment on these projects. *Id.* at 1151.

*Summers* is instructive here. The *Summers* Court rejected standing in part because there was no evidence of any particular timber sale or other project claimed to be unlawfully subject to the Forest Service's regulation. As in *Summers,* the Plaintiffs here fail to challenge any individual application that is the product of RGP 20. There is no allegation or evidence that RGP 20 has been, or will be used as means to fill low-quality wetlands. Of course, the Court expresses no opinion on the merits of any potential claim or challenge that may emerge from an application granted under the authority of RGP 20. However, without a specific RGP 20 application Plaintiffs cannot show that their concrete interests are imminently threatened. On this record, there is no justiciable case or controversy before the Court.

**IT IS THEREFORE ORDERED AND ADJUDGED**, that for the reasons stated above, this matter is DISMISSED WITHOUT PREJUDICE for lack of standing. A separate judgment will be entered herein in accordance with this Order as required by FED. R. CIV. P. 58.

**SO ORDERED AND ADJUDGED** this the 27th day of July, 2009.

*s/ Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE